

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| RICHARD D. BAILLIE,<br><br>    Plaintiff,<br><br>vs.<br><br>NESTLE USA, INC.,<br><br>    Defendant. | Case No. CV-99-03470 CAS (AJWx)<br><br>ORDER GRANTING SUMMARY JUDGMENT |

I. <u>INTRODUCTION</u>

On March 1, 1999, plaintiff Richard D. Baillie filed suit in Superior Court of the State of California, alleging breach of contract, breach of implied contract, and breach of the implied covenant of good faith and fair dealing. Defendant Nestle USA, Inc., ("Nestle") removed the action to this Court on April 1, 1999, on the ground that plaintiff's claims are governed exclusively by the Employee Retirement Income Security Act ("ERISA") and thus are preempted by ERISA. 29 U.S.C. § 1001 <u>et seq</u>. Plaintiff's claim arises out of the termination of his participation in Nestle's employee stock benefits plan. The matter is presently before the Court on Nestle's motion for summary

judgment.

## II. RELEVANT FACTS

### A. BACKGROUND

Beginning in 1970, plaintiff was employed by Nestle affiliates, principally in South Africa. Deposition of Richard Baillie, 17:23-23:5. In 1987, plaintiff transferred to Nestle USA and began working as the Director of Manufacturing Services in Glendale, California. Baillie Depo., 25:10-18. He was later promoted to a vice president position. 26:13-15.

At the end of 1990, Nestle adopted a profit sharing plan called the Corporate Phantom Stock Plan (the "Plan"), which awarded participants fictitious units of stock in Nestle's parent company, Nestle Holdings, Inc. The Plan allowed participants to have the units valued at specified times and then receive any appreciation in value since the time they received the units. Declaration of Doris A. Williams, Exh. A, p. 3. The Plan's stated purpose was to provide an incentive for corporate officers to remain employed with Nestle, and to compensate those employees "who are instrumental in ensuring the growth, development, and financial success" of the company. Id., Exh. B, p. 24.

As an eligible vice president, plaintiff began participating in the Plan as of December 31, 1990. Around that time, he attended an informational meeting announcing the introduction of the Plan during which it was explained that Plan participants would lose eligibility should they leave Nestle USA and transfer to some other Nestle affiliate or entity abroad. Baillie Depo., 93:1-95:4. A summary of the Plan was also distributed at the meeting. Id., 94:10-15.

B. <u>THE PLAN</u>

The Plan summary contained a section specifically addressing eligibility after transfer:

> <u>SPECIAL RULES CONCERNING TRANSFERS</u>
>
> A participant whose employment is transferred from one corporation to another corporation within the Nestle USA operating group will not be treated as incurring a termination of employment and will continue to participate in the Plan. A participant whose employment is transferred to an affiliate of Nestle USA which is <u>not</u> part of the Nestle USA operating group will be treated, <u>unless the committee decides otherwise</u>, as having <u>voluntarily</u> terminated his employment with Nestle USA and all affiliates which are part of the Nestle USA operating group (see above).

Baillie Depo., Exh. 4, p. 49.

The Plan provided for its administration and interpretation by a committee (the "Committee") of three persons. Williams Decl., Exh. B, p. 35. The Plan further established that all Committee decisions are "final, conclusive and binding upon all parties" and that "any person participating in the Plan thereby agrees to accept as final, conclusive and binding the decisions of the Committee." <u>Id.</u>, p. 36.

The Plan itself also states that all units awarded to a participant but not previously valued will be forfeited if a participant "Terminates Employment by reason of an outside transfer" ""unless the Committee rules otherwise pursuant to Section 7.1". Williams Decl., Exh. B, p. 40. Section 7.1 explains that "unless

otherwise determined by the Committee . . . (ii) an Outside Transfer shall constitute a Termination of Employment." Id., p. 40. The Plan defines an Outside Transfer as "the transfer of a Participant's employment from the Corporation to an Outside Affiliate or from an Affiliate to an Outside Affiliate." Id., p. 30.

C. PLAINTIFF'S TRANSFER TO NESTEC

In early 1995, plaintiff accepted a transfer to Nestec, a subsidiary of the Swiss parent corporation Nestle S.A., located in Vevey, Switzerland. Baillie Depo., 42:2-5. As a condition of acceptance, plaintiff wanted his "benefits to remain as they are." Id., 61:23-25. He specifically requested that while working for Nestec he remain on the Nestle USA payroll and continue to pay United States Social Security taxes so that he could eventually fulfill eligibility requirements for Social Security benefits and to help him become a United States citizen. In addition, plaintiff requested that he remain covered by Nestle's medical plan to ensure him post-retirement United States coverage for his diabetes. Id., 55:1-22, 66:18-22, 181:23-25. Plaintiff never told anyone that a condition of his accepting the Nestec position was remaining in the Plan. Id., 61:23-25, 62:1-16. Plaintiff intended that he was to retire from his position in Switzerland and was not to return to Nestle's Glendale office. Id., 49:6-17.

A memorandum dated March 30, 1995, outlined the terms of his new position as Nestec's Vice President of Milk and Nutrition. Baillie Depo., Exh. 3. It provided that plaintiff would remain on the payroll of Nestle USA with Nestec reimbursing Nestle for plaintiff's salary payments on a regular basis. Id. Plaintiff would also continue

to pay Social Security taxes and remain in the Nestle USA pension plan and medical, hospitalization and dental plans, "plus any other coverage he now enjoys." Id. Enclosed with the memorandum was a copy of Nestle's "Expatriation guidelines". Baillie Decl., Exh. 2. These guidelines "addressed the complexities of moving people around the world" but excluded "all aspects of remuneration and fringe benefits." Id., Exh. 2, p. 3. They expressed Nestle's philosophy that a transfer should be cost neutral to the transferee. Id.

After accepting the position with Nestec, plaintiff approached Cam Starrett, executive vice-president of Nestle USA in Glendale, with a request to retain his participation in the Plan. Baillie Depo., 172:2-25, Exh. 12. Ms. Starrett "did not commit to anything" but said she would discuss plaintiff's request with the Committee. Id. At this time, plaintiff was aware that the Committee would have to approve his continued participation in the Plan. Id., 175:5-17. Plaintiff received no response from either Ms. Starrett or the Committee. Id., 175:18-25. Plaintiff began working as Nestec's Vice President of Milk and Nutrition on or about May 1, 1995. Id., 42:2-12.

The Plan's Committee addressed the effect of plaintiff's transfer to Nestec in Switzerland on his participation in the plan at a May 25, 1995 meeting and determined that his employment had been terminated rendering him ineligible to participate in the Plan. The Committee's minutes from that meeting explain:

> It was brought to the attention of the Committee that Dick Baillie had recently ceased to be an employee of Nestle USA group and had accepted employment with Nestec Ltd. and, therefor, absent an exception being made by the Committee pursuant

> to Section 9.3(b) of the Plan, all Units of Mr. Baillie which have not been valued would forfeit due to an Outside Transfer. The Committee unanimously determined that an exception to Section 9.3(b) would not be appropriate in Mr. Baillie's situation to allow him to continue to participate in the Plan.

Williams Decl., Exh. C, p. 76.

While working for Nestec in 1996, plaintiff contacted Cam Starrett to inquire as to why he had not received notification of the value of his shares under the Plan, such as he had received in the prior four calendar years. Baillie Depo., 80:19-81:3, 173:11-24. Ms. Starrett suggested he make a written inquiry and request to the Plan's Committee, and plaintiff did so. In a letter dated March 13, 1996, plaintiff requested that the Committee make an exception to the general rules and permit him to participate in the plan. As support, plaintiff listed four reasons why he was reluctant to accept the move to Nestec in Switzerland.[1] The Committee responded by letter dated July 22, 1996

---

[1] Those reasons are:

1) plaintiff had applied for American citizenship and needed to protect his green card to remain eligible;

2) plaintiff wanted to retain his home in Los Angeles as a place to return and to provide a home for his children who were students and for whom he still provided housing;

3) plaintiff's home had been severely damaged in the Northridge earthquake and insurance covered only part of the damage;

(continued...)

and denied plaintiff's request for participation in the Plan. Baillie Depo., Exh. 13. The letter stated:

> The Committee carefully reviewed your letter and your request. Although the Committee is sympathetic with the items mentioned in your letter, e.g. your desire to become a U.S. citizen, your desire to retain your home in Los Angeles, and the earthquake damage to your Los Angeles home; the Committee does not believe these circumstances are grounds for it to grant an exception to your termination of employment due to an Outside Transfer.

Id.

Plaintiff now claims that he was entitled to participate in the Plan, and he challenges the Committee's denial of his right to participate.

III. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party

---

[1](...continued)
    4) because plaintiff was in Switzerland, his wife had to hire professionals to do many repairs to plaintiff's home that he would have been able to do himself, had he been there, and those professionals exploited his wife to the extent that she almost suffered a breakdown.

Baillie Depo., Exh. 12.

has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party bears the burden of proof at trial, "the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Gipson v. Kajima Eng'g & Constr., Inc., 972 F. Supp. 537 (C.D. Cal. 1997).

If the moving party has sustained its burden, the nonmoving party must then identify specific facts, drawn from materials on file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested. See Fed. R. Civ. P. 56(c). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990). See also Celotex Corp., 477 U.S. at 324. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. See also Abromson v. American Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light

most favorable to the party opposing the motion." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted); <u>Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co.</u>, 121 F.3d 1332, 1335 (9th Cir. 1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. See <u>Matsushita</u>, 475 U.S. at 587.

IV. <u>EVIDENTIARY ISSUES</u>

Documents upon which the parties rely to create or refute a triable issue of fact must "be authenticated by affidavits or declarations of persons with personal knowledge through whom they could be introduced at trial." <u>Zoslaw v. MCA Distrib. Corp.</u>, 693 F.2d 870, 883 (9th Cir. 1982). "A document which lacks a proper foundation to authenticate it cannot be used to support a motion for summary judgment." <u>Hal Roach Studios v. Richard Feiner & Co.</u>, 896 F.2d 1542, 1551 (9th Cir. 1990).

Nestle has objected to some of the evidence offered by plaintiff. However, in reaching its decision, the Court has not relied on the evidence to which Nestle objects. Its objections are therefore moot.

V. <u>ANALYSIS</u>

A. <u>STANDARD OF REVIEW</u>

A denial of benefits under an ERISA plan is reviewed <u>de novo</u> "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989); <u>Snow v. Standard Ins. Co.</u>, 87 F.3d 327, 330

(9th Cir. 1996). Where the benefit plan gives the administrator discretionary authority, the Court instead applies an "arbitrary or capricious" standard when reviewing the decision. Snow, 87 F.3d at 330; Atwood v. Newmont Gold Co., Inc., 45 F.3d 1317, 1321 (9th Cir. 1995). The Snow court also noted that the arbitrary or capricious standard is identical to an abuse of discretion standard. See Snow, 87 F.3d at 331.

It is apparently undisputed in this case that, by the terms of the Plan, the Committee vested with the power to administer and interpret the Plan maintained discretionary authority to determine eligibility for participation in the Plan or to construe the terms of the Plan. This would indicate that Nestle's decision to terminate plaintiff's participation in the Plan should be reviewed under the abuse of discretion standard.

B. APPLICATION OF THE ARBITRARY OR CAPRICIOUS STANDARD

To establish that the Committee's decision was arbitrary or capricious, plaintiff must prove that the Committee made "a decision without any explanation, or in a way that conflicts with the plain language of the plan, or that is based on clearly erroneous findings of fact." Atwood, 45 F.3d at 1323-24. "That standard certainly does not permit the overturning of a decision where there is substantial evidence to support the decision, that is, where there is 'relevant evidence [that] reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence.'" Snow, 87 F.3d at 332 (quoting Maynard v. City of San Jose, 37 F.3d 1396, 1404 (9th Cir. 1994)). When reviewing a defendant's decision to deny participation in a benefits

plan for arbitrariness or capriciousness, the Court must consider only the information that the defendant had before it when it decided to deny participation. Snow, 87 F.3d at 332; Taft v. Equitable Life Assur. Soc., 9 F.3d 1469, 1471-72 (9th Cir. 1993).

It appears that the Committee's decision to deny plaintiff the right to participate in the Plan following his transfer to Nestec was neither arbitrary nor capricious and, thus, the Committee did not abuse its discretion in denying his request to participate in the Plan. The Plan summary clearly sets forth the Plan's policy regarding transfers: "[a] participant whose employment is transferred to an affiliate of Nestle USA which is not part of the Nestle USA operating group will be treated, unless the committee decides otherwise, as having voluntarily terminated his employment with Nestle USA". According to the minutes of the Committee's May 25, 1995 meeting, the Committee based its determination that plaintiff was ineligible to participate on his transfer to Nestec in Vevey, Switzerland. It appears undisputed that such a transfer would constitute an "Outside Transfer" under the Plan rendering plaintiff ineligible to participate.

In addition, subsequent to the May 1995 meeting, the Committee met again to discuss plaintiff's participation in the Plan in response to plaintiff's March 13, 1996 letter requesting reconsideration of the Committee's decision. In its response dated July 22, 1996, the Committee explained that it had carefully considered all the items mentioned in plaintiff's request, including plaintiff's desire to become a United States citizen, his desire to retain his home in Los Angeles, and the earthquake damage to his house. Nonetheless, the Committee did not conclude that these circumstances were grounds for allowing plaintiff to participate in the Plan following his transfer

to Switzerland.

Because the Plan explicitly gave the Committee sole authority to make Plan participation decisions, and because the Committee's decision complies with the letter of the Plan requirements, the Court finds that the Committee did not act in an arbitrary or capricious manner in determining that plaintiff was ineligible to participate in the Plan. To the contrary, the Committee considered each of plaintiff's contentions presented in his request for reconsideration and the decision is supported by the evidence. The Plan's stated purpose, for example, was to provide an incentive for corporate officers to remain with Nestle and to compensate valuable employees. Allowing plaintiff to participate in the Plan because of his pending citizenship application, the earthquake damage to his Los Angeles home, or his desire to retain his Los Angeles house would neither provide plaintiff an incentive to remain with Nestle (he had already accepted a transfer) nor compensate him as a valuable employee (he was working for Nestec), and thus would not accord with the purpose of the Plan.

Plaintiff nonetheless contends that the Committee abused its discretion and denied him a full and fair hearing in failing to consider five contentions which, he argues, would have shown that plaintiff was a Nestle employee while working in Switzerland. Those five contentions are:

> 1) plaintiff's one condition to accepting the transfer was that he remain on Nestle's payroll until his retirement so that the assignment in Switzerland would have no net effect on him;
>
> 2) the fact that the terms of his assignment were

        that he would remain on Nestle's payroll and his salary, including bonus, were to be revised in accordance with Nestle's salary review policy;

        3) plaintiff was to be maintained in the Nestle USA pension plan and continue to pay United States Social Security taxes;

        4) plaintiff's health benefits were to remain unchanged; and

        5) Nestle's "Expatriation guidelines" provide for an overriding philosophy of "no loss, no gain" and a transfer should therefore be cost neutral to the transferee.

Baillie Opposition, p. 13. The Court, however, is not persuaded that the Committee's consideration of these five contentions would have changed its decision. It appears accurate that, although plaintiff worked at Nestec's Vevey, Switzerland office, Nestle payed his salary and he continued receiving Nestle health and pension benefits. However, Nestle authorized such a situation to accommodate plaintiff's explicit special requests. Baillie Depo., 55:1-22, 63:3-16. Plaintiff has presented no evidence demonstrating that Nestle made these accommodations for plaintiff based on his desire that the transfer have "no net effect" on him. See Id. Rather, plaintiff communicated to Nestle specific reasons for his requests: plaintiff's pending United States citizenship application, his desire to retire and collect Social Security benefits in the United States, and his possible difficulty in

obtaining medical insurance due to his diabetes. Id. It thus does not appear, as plaintiff contends, that he remained on Nestle's payroll and benefits plan because he was a Nestle employee but, rather, as a result of Nestle's accommodation of his unique circumstances. Moreover, the arrangement required Nestec to reimburse Nestle, so that Nestec bore all costs of plaintiff's salary and benefits. Id., 84:17-85:7.

The fact that plaintiff's salary, including bonus, was to be revised according to Nestle's salary review policy similarly does not compel the conclusion that he was a Nestle employee. Although this fact might suggest an employment relationship, the other facts presented by plaintiff fail to support such an argument. On its own, this fact fails to demonstrate that plaintiff was employed by Nestle. Moreover, since plaintiff was on the Nestle payroll and enjoying Nestle benefits, it seems logical that his salary would be reviewed in accordance with Nestle policy.

Finally, the Court finds that the "no loss, no gain" philosophy stated in the "Expatriation guidelines" does not support plaintiff's argument. The guidelines explicitly do not address "all aspects of remuneration and fringe benefits" such as the Plan, rather, they appear to relate to the formalities and practical concerns associated with an international transfer. Baillie Decl., Exh. 2, Section 2.

Accordingly, in light of the liberal standard applicable to the Committee's decision, the Court finds that the Committee's failure to consider the five contentions set forth by plaintiff was not an abuse of discretion. The Committee addressed plaintiff's participation on two separate occasions and considered each of his stated reasons for reconsideration before applying the Plan's clear terms. Furthermore, the five contentions set forth by plaintiff do not support his

1  assertion that he was a Nestle employee.

2

3  VI.  CONCLUSION

4   For these reasons, defendant's motion for summary judgment is
5  granted.

6

7   IT IS SO ORDERED.

8

9

10 DATED: December 14, 1999.

11                              _____
                                 CHRISTINA A. SNYDER
12                               UNITED STATES DISTRICT JUDGE